# ANTHONY DALEY *v.* WESLEYAN UNIVERSITY
## (AC 18983)

Landau, Mihalakos and Daly, Js.

Argued October 31, 2000—officially released May 1, 2001

*Jacques J. Parenteau,* for the appellant (plaintiff).

*Felix J. Springer,* with whom was *Kenneth W. Gage,* for the appellee (defendant).

*Opinion*

MIHALAKOS, J. The plaintiff, Anthony Daley, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the defendant, Wesleyan University, in this action concerning the alleged breach of an employment contract. On appeal, the plaintiff claims that the court improperly (1) instructed the jury concerning his breach of contract claim and (2) excluded expert testimony relating to his scholarship. We affirm the judgment of the trial court.

The record discloses the following facts and procedural history. On January 26, 1987, the defendant offered the plaintiff a four year initial appointment as an assistant professor in its department of government. The following month, the plaintiff accepted the offer, which included an annual salary of $26,500. The position commenced on July 1, 1987, and was scheduled to terminate on June 30, 1991.

When the plaintiff began his employment, the defendant provided him with a manual titled, "The Blue Book," which included the bylaws of the faculty. It is undisputed that the employment contract between the parties incorporated the provisions of The Blue Book, and that The Blue Book's terms and provisions apply to every faculty member.[1]

During the third year of the plaintiff's initial appointment, the tenured faculty of the department of govern-

---

[1] The Blue Book states in relevant part: "PREAMBLE TO FACULTY GOVERNANCE AND POLICIES. Appointment to the Wesleyan Faculty, whether on a part-time, full time, non-tenured or tenured basis, is subject to and governed by the terms and provisions of the following section."

ment (tenured faculty) evaluated his performance.[2] Three basic criteria were used: Teaching, scholarship and colleagueship.[3] Overall, the tenured faculty's evaluation of him was favorable; however, concerns were expressed about the plaintiff's level of scholarship. On or about July 2, 1990, the plaintiff received a letter from the chairperson of the department of government (chairperson), informing him of the favorable evaluation and that he had been reappointed to a second four year term, which would expire on June 30, 1995.[4] The

[2] The Blue Book states in relevant part: "Before the end of the third year of an initial appointment of four years, a decision shall be made either to terminate the appointment at the end of the fourth year or to reappoint. Such reappointment shall normally be for four years . . . ."

[3] The Blue Book states in relevant part: "Teaching, scholarship, and colleagueship are the three basic criteria by which a candidate for appointment, reappointment, and promotion to the high ranks should be judged. Both performance and promise in these categories should be evaluated.

"(1) For purposes of evaluation, teaching refers primarily to classroom performance and promise as evaluated by students and other teachers. The influence on and contribution of the candidate to the teaching of his/her colleagues should also be considered. Supplementary evidence might include a candidate's contribution to formulating new or improved courses, programs, or teaching techniques and also his/her availability to and effect on students as a counselor.

"(2) Scholarship refers to intellectual power, depth and breadth of knowledge, originality and skill in research, creativity and significance of executed work, past contributions to knowledge, and promise of future growth. Published, performed, and executed works, important as a contribution to knowledge and understanding, are also the clearest measure of their author's scholarship. Other evidence might include mastery of skills and disciplines outside the candidate's field.

"(3) Colleagueship refers to contributions to the collegial life of the faculty as a community of scholars. Of particular importance is effectiveness in stimulating the thinking of colleagues, and encouragement and constructive criticism of their work, both on the more formal occasions when Faculty meet for serious discussion and in day-to-day associations with colleagues inside or outside the department. More generally, the value of a colleague is a measure of his/her participation in the intellectual life of the University beyond the classroom and beyond special research interests, and of the colleague's share in establishing the conditions for sustaining a stimulating intellectual atmosphere at Wesleyan."

[4] The Blue Book states in relevant part: "Reappointment should not be taken to imply a subsequent favorable decision on tenure."

letter also conveyed the tenured faculty's concerns about his scholarship: "We are concerned that you take the time to revise your dissertation before getting too far along in your new project. It is important to complete the dissertation project in its revision to a book manuscript and sent [sic] out for review. The dissertation is a little unwieldy in length and focus. You have proposed revisions that will make the work more sharply focused . . . . We are confident that you will be able to make the necessary changes, and that the resulting book will be first-rate."

During the next three years, the plaintiff, in an effort to generate a quality manuscript, revised his dissertation by adding five new chapters and modifying three existing chapters. The plaintiff, however, declined offers from the tenured faculty to review his manuscript and to counsel him on how to improve his scholarship.

In May, 1993, the plaintiff, who was nearing the end of his sixth year as an assistant professor, applied for tenure.[5] The plaintiff's application included his manuscript, the names of three professors outside of Wesleyan and a request that the department of government consult them when evaluating his scholarship.[6] In

[5] The Blue Book states in relevant part: "Promotions conferring tenure may be made at any time. Decisions on such promotions must be made by the end of the seventh year of the appointee's full-time college or university teaching . . . ."

The Blue Book defines "tenure" as a status granted to faculty members "[a]fter the expiration of a probationary period" that signifies that their service "should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies."

[6] The Blue Book states in relevant part: "Guidelines for the Evaluation of Candidates for Promotion Incurring Tenure . . .

* * *

"(2) Scholarship

"a. Outside Opinions

"1. Ordinarily the chair should solicit from outside the Wesleyan faculty three to five opinions from qualified authorities of the department's choosing.

"2. The candidate may name additionally up to three such authorities and request the chair to consult them. There may be more or fewer for cause.

response, the department of government solicited appraisals of the plaintiff's scholarship from nine professors outside of Wesleyan, including the three named in the plaintiff's application. By October 12, 1993, each of the nine professors had responded by letter. Generally, the appraisals of the plaintiff's scholarship were mixed. Several of the professors criticized the manuscript for its lack of clarity and organization.

The tenured faculty convened eight times to consider the plaintiff's application for tenure.[7] Again, the three basic criteria were used: Teaching, scholarship and colleagueship.[8] The tenured faculty conducted a lengthy and thorough review of the plaintiff's record, which included (1) all the published and unpublished material that the plaintiff authored and submitted,[9] (2) the plaintiff's statement about his research, teaching and scholarship, (3) syllabi from the courses that the plaintiff taught, (4) evaluations of the plaintiff's teaching and (5) the nine letters of appraisal from professors outside of Wesleyan. At the conclusion of its deliberations, the

---

In both cases, the replies should be held in confidence from the candidate. The solicitors of the letters should represent that these practices of confidentiality are in force . . . . The letters of solicitation should inquire at least concerning (a) the degree of acquaintance with the work of the candidate, (b) an appraisal of the work itself and (c) the candidate's standing in his/her field amongst scholars of comparable age and experience. . . ."

[7] The Blue Book states in relevant part: "After appropriate consultation with the department, and with the concurrence of a majority of the tenured faculty, the Chair recommends to the President promotion to tenure or not."

[8] See footnote 3.

[9] The Blue Book states in relevant part: "Guidelines for the Evaluation of Candidates for Promotion Incurring Tenure . . .

\* \* \*

"(2) Scholarship

"c. Bases of Judgment. The usual evidence of scholarly publications consists of books, monographs, and articles published in, or accepted for publication by, recognized scholarly journals. Such evidence might include anthologies, translations, technical reports, reviews, commentaries, textbooks, and so on, where such productions are pertinent to the evaluation of the candidate's performance and promise as a scholar."

tenured faculty voted eight to one not to recommend the plaintiff for tenure. On October 26, 1993, the chairperson notified the plaintiff of the decision.

On November 2, 1993, the chairperson wrote a letter to the vice president for academic affairs, detailing why the plaintiff was not recommended for tenure.[10] The letter also contained and discussed excerpts from several of the appraisals that had been received from professors outside of Wesleyan. In sum, eight of the nine

---

[10] In the letter, the chairperson states in relevant part: "The decision not to recommend tenure is based principally on our assessment of the scholarly record. The Department's customary standard for tenure is the completion of a major project of research and writing in the form of a book, a monograph, or a series of related articles. We also require significant progress toward the completion of a second scholarly project. In our judgment, Tony has not met this standard.

\* \* \*

"Tony's chief scholarly undertaking to date is his manuscript 'Labor Mobilization and Labor Policy: The Demise of French Exceptionalism.' The manuscript is an outgrowth of his dissertation, 'Labor and Industrial Change: The Politics of Steel in France.' Tony did not include the dissertation in the material he submitted for the tenure review. In response to an inquiry from us, he reported that the manuscript and the dissertation were, in his own words, 'two very different projects which share the same empirical base.'

"The manuscript has not been published in either form, and this weighed heavily in our deliberations. But the lack of a published manuscript was not decisive. All of us agree the manuscript as it now stands needs revisions, and, with one exception, we believe it is in need of major substantive changes before it can be considered a completed, major project of research and writing, even if published in its current draft. Essentially, the project remains unfinished. Let me elaborate.

\* \* \*

"In his manuscript, Tony undertook a case study of managed capitalism, using France and the French steel industry as his focal point. Case studies of this kind are widely accepted and widely employed in political science. The best case studies go beyond the mere descriptive, or the mere telling of a story. The best are rooted in the literature and are used to confirm, dispute and refine general propositions, and on occasion to generate new ones. In our judgment, Tony's manuscript does not measure up to what is expected of such a study.

\* \* \*

"Nor, in our judgment, has Tony produced a series of related articles that would constitute a major project of research and writing."

tenured faculty members of the department of government did not consider the plaintiff's scholarship to be of sufficient strength to merit tenure.

During the plaintiff's eighth and final year as an assistant professor, the department of government permitted him to apply for reconsideration of its decision. The tenured faculty unanimously found that the plaintiff's scholarly record failed to meet "the exceptional standards required for an eighth year reconsideration." Subsequently, the plaintiff exercised all of the procedural rights of review afforded to him under The Blue Book. The decisions of the tenured faculty were affirmed, and the plaintiff's employment ended on June 30, 1995.

On December 5, 1995, the plaintiff brought the action that is the subject of this appeal. On January 11, 1996, the plaintiff filed a four count amended complaint, alleging, inter alia, that the defendant had breached its employment contract with him. Additional facts and procedural history will be provided as necessary.

I

The plaintiff's first claim consists of several related challenges to the jury instructions concerning his breach of contract claim. The plaintiff alleges that the court improperly instructed the jury to find in his favor on his breach of contract claim only if he proved by a preponderance of the evidence that the defendant's decision denying his application for tenure was made arbitrarily, capriciously or in bad faith. The plaintiff also argues that (1) the court, in its instructions, failed to " 'unlink' what could be considered two separate contract claims" and that (2) neither of those contract claims required him to prove that the defendant acted arbitrarily, capriciously or in bad faith to prevail. We disagree.

In part I A, we will examine the plaintiff's amended complaint and determine (1) the scope of his contract

claims, (2) which facts properly were alleged in support of those claims and (3) of those facts, which were placed at issue by virtue of the evidence in the case. In part I B, we determine, given our conclusions in part I A, that the plaintiff did have the burden of establishing, inter alia, that the defendant acted arbitrarily, capriciously or in bad faith.

## A

### The Amended Complaint and the Evidence

"A court's charge is not to be examined in a vacuum. Rather, it is to be viewed in the context of the factual issues raised at the trial." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 237, 710 A.2d 732 (1998). Because "[f]acts found but not averred cannot be made the basis for a recovery"; *Malone* v. *Steinberg*, 138 Conn. 718, 721, 89 A.2d 213 (1952); accord *Tedesco* v. *Stamford*, 20 Conn. App. 51, 57, 563 A.2d 1046 (1989), rev'd on other grounds, 215 Conn. 450, 576 A.2d 1273 (1990); "[i]t is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Internal quotation marks omitted.) *Matthews* v. *F.M.C. Corp.*, 190 Conn. 700, 705, 462 A.2d 376 (1983). Consequently, "[t]he plaintiff was entitled to have the jury correctly, fairly and adequately instructed in accordance with the matters and law in issue by virtue of the pleadings and the evidence in the case"; *Faulkner* v. *Reid*, 176 Conn. 280, 281, 407 A.2d 958 (1978); and "[t]he trial court need charge only on those points of law that arise pursuant to the claims of proof advanced by the parties in their pleadings." *Drummond* v. *Hussey*, 24 Conn. App. 247, 248, 588 A.2d 223 (1991); accord *Nesbitt* v. *Mulligan*, 11 Conn. App. 348, 351, 527 A.2d 1195, cert. denied, 205 Conn. 805, 531 A.2d 936 (1987); see *Goodmaster* v. *Houser*, 225 Conn. 637, 648, 625 A.2d 1366 (1993) ("[t]he court should, however, submit to the jury all 'issues as

outlined by the pleadings and as reasonably supported by the evidence' "). Accordingly, our analysis begins with an examination of the pleadings.

The second count of the amended complaint consists of the plaintiff's allegation that the defendant breached its contract with him. The facts alleged by the plaintiff as constituting the breach are contained in paragraphs eighteen and nineteen. They state as follows: "18. The University has *breached the contract of employment between itself and Daley, including the implied covenant of good faith and fair dealing,* by violating the *specific* and *implicit promises* made to Daley with respect to the *methods* to be employed by the University to determine his eligibility for tenure.

"19. *More specifically,* the University failed to make a *good faith effort* to determine the quality of Daley's work by *ignoring* the opinions of those qualified to judge the merits of Daley's work. Instead, the University relied upon the recommendations of the Government Department which were *biased, inexpert,* and *inaccurate.*" (Emphasis added.)

"[T]he interpretation of pleadings is always a question of law for the court . . . . [Our Supreme Court has] pointed out that [t]he burden [is] upon the pleaders to make such averments that the material facts should appear with reasonable certainty; and for that purpose [the pleaders] were allowed to use their own language. Whenever that language fails to define clearly the issues in dispute, the court will put upon it such reasonable construction as will give effect to the pleadings in conformity with the general theory which it was intended to follow, and do substantial justice between the parties. . . . But essential allegations may not be supplied by conjecture or remote implication." (Citations omitted; internal quotation marks omitted.) *Cahill* v. *Board of Education,* 198 Conn. 229, 236, 502 A.2d 410 (1985).

The plaintiff alleges, inter alia, that the court, in its jury instructions, failed to " 'unlink' what could be considered two separate contract claims," namely, that the defendant (1) breached the contract when it erroneously concluded that the plaintiff's scholarship was insufficient to merit tenure and (2) breached the contract when the department of government either (a) failed to inform him of its "conception of what constituted a 'completed major work' " or (b) failed to apply the definition of "completed major work" that it communicated to him.[11] Implicit in the plaintiff's argument is the assumption that both of those contract claims were pleaded adequately. See *Drummond* v. *Hussey*, supra, 24 Conn. App. 248.

Our examination of paragraphs eighteen and nineteen of the second count discloses that two separate claims for breach of contract are pleaded; however, we disagree with the plaintiff's implicit characterization of them.[12] Paragraph eighteen of the amended complaint is unartfully drafted. Its language, which presumably was chosen by the plaintiff, fails to define clearly the issues in dispute, for it does not aver material facts with reasonable certainty. See *Cahill* v. *Board of Education*, supra, 198 Conn. 236. The phrase "specific and implicit promises," and the word "methods" are imprecise and, when unaccompanied by further defining language, are

[11] The Blue Book states in relevant part: "These general University criteria [i.e., teaching, scholarship and colleagueship] are meant to be interpreted by departments and programs in the specific terms appropriate to their fields and disciplines. Such interpretations, which may be in writing, should be communicated by department and program chairs both to faculty members when hired and to the administration."

[12] It is important to note that the plaintiff never filed a motion for permission to file a second amended complaint. During a trial, whenever a disparity develops between a party's allegations and the evidence that has been admitted, it is that party's responsibility to file a motion for permission to amend its pleadings, and then, if permission is granted, to amend its pleadings so that they conform to the evidence. See *Strimiska* v. *Yates*, 158 Conn. 179, 185, 257 A.2d 814 (1969).

inadequate to convey material facts with reasonable certainty. Only by conjecture or remote implication can a court or an opposing party hope to ascertain what promises were made and which were broken, and what methods were promised and which were employed instead.[13] Construing paragraph eighteen reasonably, all we discern is that the plaintiff alleges that the defendant (1) breached a contract with the plaintiff, and (2) breached the covenant of good faith and fair dealing.

While paragraph nineteen is also unartfully drafted, it does provide some guidance. In it, the plaintiff claims that the defendant "failed to make a good faith effort to determine the quality of [his] work," and he alleges two facts in support of his claim: The defendant (1) "ignor[ed] the opinions of those qualified to judge the merits of [his] work" and (2) "relied upon the recommendations of the Government Department which were biased, inexpert, and inaccurate." While the latter of the two facts is averred with reasonable certainty, the former is not, for it does not, inter alia, indicate who is qualified to judge the plaintiff's work. Although we recognize that "essential allegations may not be supplied by conjecture or remote implication"; (internal quotation marks omitted) id.; we assume arguendo that the former is adequate and that, in it, the plaintiff is alleging that the defendant "ignor[ed]" the nine letters appraising his scholarship that were received from professors outside of Wesleyan. Furthermore, in paragraph nineteen, the plaintiff expressly claims only that the defendant breached the covenant of good faith and fair dealing. Because paragraph nineteen begins with the phrase "[m]ore specifically," the factual allegations contained therein reasonably can be construed as supporting the two claims alleged in paragraph eighteen, i.e.,

[13] On at least one occasion, the court asked the plaintiff, "What did I do with this complaint, this broad, broad, broad complaint?"

breach of contract, and breach of the covenant of good faith and fair dealing.

From here on, we assume arguendo that in the second count of his amended complaint, the plaintiff alleges that the defendant breached its contract with him, along with the covenant of good faith and fair dealing, when it "ignor[ed]" the nine letters appraising his scholarship that were received from professors outside of Wesleyan and relied on the department of government's recommendations, "which were biased, inexpert, and *inaccurate*." (Emphasis added.)

As alluded to previously, "[t]he [trial] court has a duty to submit to the jury no issue upon which the evidence would not reasonably support a finding." (Internal quotation marks omitted.) *Goodmaster* v. *Houser*, supra, 225 Conn. 648. Our exhaustive review of the record discloses that the jury could not reasonably have found that the defendant "ignor[ed]"[14] the nine letters. The plaintiff did not present any evidence that tended to prove that the defendant did not consider all nine letters before determining that he did not merit tenure. In fact, there was strong evidence to the contrary: The defendant's employees, namely the tenured faculty, included and discussed excerpts of several of the letters in its letter to the vice president for academic affairs that detailed why it decided not to recommend the plaintiff for tenure. We assume arguendo, however, that the plaintiff instead alleged that the defendant, through the tenured faculty, did not afford enough weight to the nine letters when evaluating the plaintiff's scholarship in connection with his application for tenure. We also conclude that the plaintiff, through that allegation, seeks to prove that the tenured faculty's determination that he did not merit tenure was inaccu-

[14] "Ignore" is defined as "to refuse to take notice of." Merriam-Webster's Collegiate Dictionary (10th Ed. 1999).

rate. Consequently, that factual allegation is subsumed by the plaintiff's remaining factual allegation that the defendant relied on the department of government's recommendations, "which were biased, inexpert, and *inaccurate.*" (Emphasis added.)

Regarding the remaining factual allegation, the plaintiff at trial did not argue or present evidence indicating that the tenured faculty was not authorized to consider his application for tenure. In fact, The Blue Book, which was admitted into evidence at trial, overwhelmingly establishes that the tenured faculty was authorized to consider his application for tenure. See footnote 7. The evidence also overwhelmingly establishes that the defendant did not "rely" on the tenured faculty's recommendation *until after* the plaintiff had exhausted all of the procedural rights of review afforded to him under The Blue Book.

In sum, two contract claims remain: The defendant (1) breached its contract with the plaintiff, along with (2) the covenant of good faith and fair dealing, when some of its employees, specifically, the tenured faculty of the department of government, rendered negative recommendations concerning the plaintiff's tenure application that "were biased, inexpert, and inaccurate," recommendations that, in effect, foreclosed the possibility that the defendant would award him tenure.

## B

### The Burden

The plaintiff, in effect, claims also that the court mischaracterized the tenured faculty's decision not to recommend him for tenure as an academic decision and that, consequently, the court's instructions to the jury were improper. The plaintiff argues that the court should not have instructed the jury to find in his favor on his contract claims only if he proved by a preponder-

ance of the evidence that the tenured faculty's decision not to recommend him for tenure was made arbitrarily, capriciously or in bad faith. The plaintiff argues that (1) the tenured faculty's decision not to recommend him for tenure was an employment decision, and (2) consequently, he should not have been required to prove that the tenured faculty acted arbitrarily, capriciously or in bad faith to prevail. We conclude that the court properly characterized the tenured faculty's decision and that the plaintiff was required to prove by a preponderance of the evidence that it made its decision arbitrarily, capriciously or in bad faith.

A proper characterization of the tenured faculty's decision must take into account the language of the contract between the plaintiff and the defendant as well as any circumstances that provide assistance in interpreting the contract language. See *Gupta* v. *New Britain General Hospital*, 239 Conn. 574, 582, 687 A.2d 111 (1996). On the present record, that assessment is purely a question of law. See id.

The Blue Book created a hybrid relationship between the plaintiff and the defendant, for on its face it enumerates requirements representative of an employment relationship as well as requirements representative of an academic relationship. See id. Under The Blue Book, a full-time, nontenured member of the faculty is required, inter alia, to teach, engage in scholarly pursuits and contribute to the collegial life of the faculty,[15] and the defendant is required, inter alia, to pay him a salary.[16] An inquiry such as whether the defendant failed to pay the plaintiff, for example, concerns a requirement

---

[15] See footnote 3.

[16] The Blue Book states in relevant part: "Faculty Salaries

"(1) In recruiting faculty, the Chair makes recommendations to the President;

"(2) The Chair also makes recommendations to the President on merit increases for continuing faculty . . . ."

representative of an employment relationship. See id., 587 & n.12. In contrast, an inquiry into whether an evaluation of a faculty member's "teaching," "scholarship" or "colleagueship" was accurate, as those terms are defined in The Blue Book,[17] concerns a requirement representative of an academic relationship because conducting such evaluations is a specialty that is strongly associated with institutions of higher learning, *and* such an evaluation "has little to do with the normal attributes of an employee relationship." Id., 586–87. Because of the hybrid nature of the contract between the plaintiff and the defendant, a functional analysis of its terms in relation to the alleged breach is required. See id.

The plaintiff, in effect, alleges that the defendant (1) breached its contract with him, along with (2) the covenant of good faith and fair dealing, when some of its employees, specifically, the tenured faculty of the department of government, rendered negative recommendations concerning his tenure application that "were biased, inexpert, and inaccurate," recommendations that, in effect, foreclosed the possibility that the defendant would award him tenure. Under The Blue Book, the tenured faculty, when considering an application for tenure, is required to judge the applicant's performance and promise in three categories: Teaching, scholarship and colleagueship. See footnote 3. As we previously intimated, we conclude that a decision that, on its face, is based exclusively on a faculty member's "teaching," "scholarship" and "colleagueship," is an academic decision. Accordingly, we conclude that the tenured faculty's decision in this case not to recommend the plaintiff for tenure is, on its face, an academic decision. Because an academic institution is afforded considerable discretion when, through its employees, it exercises its professional judgment on academic mat-

---

[17] See footnote 3.

ters, the plaintiff was required to prove by a preponderance of the evidence that the tenured faculty's decision not to recommend him for tenure was made arbitrarily, capriciously or in bad faith. See id., 595. In sum, we are not persuaded by the plaintiff's claim that the jury instructions were improper.[18]

## II

Finally, the plaintiff claims that the court improperly excluded the testimony of five expert witnesses. We disagree.

The following facts and procedural history are relevant to the plaintiff's claim. At trial, the plaintiff offered expert testimony from five of the nine professors outside of Wesleyan who had provided the tenured faculty with written appraisals of his scholarship. The plaintiff offered the five professors' testimony for the purpose of having each of them (1) explain further the content of his appraisal, specifically (a) his written opinion concerning the quality of the plaintiff's scholarship, (b) his written opinion of the plaintiff's standing in his field among scholars of comparable age and experience, and (c) his written opinion as to whether the plaintiff would merit tenure either at the professor's institution or at a comparable institution; (2) testify that, in his opinion, the standard employed by the tenured faculty when evaluating the plaintiff's scholarship was "inappropriately narrow;" (3) testify that, in his opinion, the tenured faculty, in its letter to the vice president for academic

---

[18] The plaintiff did not argue that the implied covenant of good faith and fair dealing provides greater protection than that afforded him under the arbitrary, capricious or bad faith standard previously discussed. Therefore, we assume that the implied covenant provides protection less than or equal to that afforded him under the arbitrary, capricious or bad faith standard. See *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 598. Consequently, the plaintiff's breach of the implied covenant claim is either subsumed by or coterminous with his breach of contract claims. In either case, it no longer is relevant to our analysis.

affairs, misrepresented the letters of appraisal in a manner that "was unsavory in academic quarters"; and (4) testify that, in his opinion, the tenured faculty's decision not to recommend the plaintiff for tenure was made arbitrarily or capriciously.

The court did not permit the five professors to present expert testimony; however, all nine letters of appraisal were admitted into evidence, as was the tenured faculty's letter to the vice president for academic affairs. Furthermore, no evidence was presented that tended to prove that the plaintiff and the defendant had agreed (1) to supplement the definition of scholarship that is expressed in The Blue Book or (2) to evaluate the plaintiff's scholarship in accordance with a standard used by other academic institutions.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citations omitted; internal quotation marks omitted.) *State* v. *Billie*, 250 Conn. 172, 180, 738 A.2d 586 (1999). Furthermore, "[t]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995). "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either

more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Billie*, supra, 181.

We now consider, in the order that they previously were presented, the plaintiff's four purposes for offering the professors' testimony. First, the plaintiff sought to have each of the professors further explain the content of his letter of appraisal. When the tenured faculty was considering the plaintiff's application for tenure, it did not have the benefit of the explanations of the letters of appraisal that the plaintiff proffered. Moreover, The Blue Book did not require the tenured faculty to solicit such explanations. The issue before the jury was whether the tenured faculty *made* its decision arbitrarily, capriciously or in bad faith, and, thus, each of the letters of appraisal, all of which were admitted into evidence, "speaks for itself." *State* v. *Reddick*, 36 Conn. App. 774, 791, 654 A.2d 761, cert. denied, 232 Conn. 922, 656 A.2d 671 (1995). Because the proffered testimony did not have "a logical tendency to aid the trier in the determination of [the] issue"; (internal quotation marks omitted) *State* v. *Billie*, supra, 250 Conn. 181; it properly was excluded.

Second, the plaintiff sought to have each of the professors testify that, in his opinion, the standard employed by the tenured faculty when evaluating the plaintiff's scholarship was "inappropriately narrow." At trial, no evidence was presented that tended to establish that the plaintiff and the defendant had agreed (1) to

supplement the definition of scholarship that is expressed in The Blue Book or (2) to evaluate the plaintiff's scholarship in accordance with a standard used by other academic institutions. Moreover, none of the five professors had special knowledge regarding the defendant's standards for granting tenure. Thus, the plaintiff failed to meet his burden of establishing a proper foundation for that testimony.

Third, the plaintiff sought to have each of the professors testify that, in his opinion, the tenured faculty, in its letter to the vice president for academic affairs, misrepresented the letters of appraisal in a manner that "was unsavory in academic quarters." Presumably, the plaintiff offered that testimony as circumstantial evidence that the tenured faculty acted in "bad faith"[19] when it decided not to recommend him for tenure. All of the letters that ordinarily would be scrutinized when conducting such an inquiry were admitted into evidence.[20] Expert testimony should be admitted only when, inter alia, the expert's "skill or knowledge is not common to the average person." (Internal quotation marks omitted.) *State* v. *Billie*, supra, 250 Conn. 180. It is unclear why the jury, absent the assistance of expert testimony, could not have read and compared the letters at issue, and properly discerned whether they constituted evidence of bad faith on the part of the tenured faculty. Accordingly, we conclude that the court did not abuse its wide discretion in excluding the professors' testimony. See id.

Fourth, the plaintiff sought to have each of the professors testify that, in his opinion, the tenured faculty's

[19] "Bad faith means more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) *Gupta* v. *New Britain General Hospital*, supra, 239 Conn. 598.

[20] As previously stated, all nine letters of appraisal were admitted into evidence, as was the tenured faculty's letter to the vice president for academic affairs.

decision not to recommend the plaintiff for tenure was made arbitrarily or capriciously. "An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact." *State* v. *Vilalastra*, 207 Conn. 35, 41, 540 A.2d 42 (1988). An expert may, however, "give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." (Internal quotation marks omitted.) *State* v. *Rodgers*, 207 Conn. 646, 652, 542 A.2d 1136 (1988). The plaintiff did not argue in his briefs to this court or at oral argument why the jury needed expert testimony to decide the ultimate issue in this case. Furthermore, our review of the record does not disclose any basis for concluding that the court abused its wide discretion when it excluded that testimony.

Accordingly, we conclude that the court properly excluded the expert testimony proffered by the plaintiff.

The judgment is affirmed.

In this opinion the other judges concurred.