### ELIZABETH HAYES *v.* YALE-NEW HAVEN HOSPITAL ET AL.*

Superior Court, Judicial District of New Haven
File No. CV 960393656S

---

[4] See footnote 1.

* Affirmed. *Hayes* v. *Yale-New Haven Hospital,* 82 Conn. App. 58, 842 A.2d 616 (2004).

Memorandum filed August 14, 2001

*Earl I. Williams*, for the plaintiff.

*Tyler, Cooper & Alcorn, LLP*, for the defendants.

PITTMAN, J. The plaintiff, Elizabeth Hayes, filed this action against the defendants, Yale-New Haven Hospital (hospital), Alvin Johnson and Leo Cooney, for damages. The plaintiff claims that she was wrongfully discharged from her employment at the hospital. The defendants deny that her discharge was wrongful. The matter was claimed to the jury trial list. Thereafter, the parties stipulated to a trial to the court, which proceeded over a period in excess of twenty days beginning on May 22, 2001, and ending with summations on July 17, 2001.

## PARTIES

The plaintiff was the geriatric programs coordinator (coordinator) at the Adler Geriatric Assessment Center (center) at Yale-New Haven Hospital at the time she was notified of her release from employment on March 4, 1996. Yale-New Haven Hospital is a large, private hospital in New Haven. Johnson was the vice president

of employee relations for the hospital. Cooney, a physician, was section chief of internal medicine and medical director of the continuing care unit, which took care of frail, elderly persons. He was acting as the interim director of the center at the time of the events of which the plaintiff complains. Cooney was the plaintiff's direct supervisor at the center. As used in this memorandum, "defendant" refers to the hospital; Johnson and Cooney will be referred to by name.

## PLEADINGS

The operative complaint is the fifth revised complaint filed March 2, 2000. It consists of eleven counts. Count nine, alleging a violation of the Fair Employment Practices Act, General Statutes § 46a-60 (a) (1), was the subject of a motion to dismiss for lack of subject matter jurisdiction that was granted by the court, *Devlin, J.,* on May 10, 2001, in the weeks leading to trial. The remaining counts as trial started were:

Count one: Breach of implied contract against Yale-New Haven Hospital;

Count two: Breach of express contract against Yale-New Haven Hospital;

Count three: Tortious interference with contract against Cooney;

Count four: Tortious interference with contract against Johnson;

Count five: Fraud against Yale-New Haven Hospital;

Count six: Promissory estoppel against Yale-New Haven Hospital;

Count seven: Intentional infliction of emotional distress against all defendants;

Count eight: Negligent infliction of emotional distress against all defendants;

Count ten: Discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against Yale-New Haven Hospital; and

Count eleven: Retaliation, for having successfully pursued an earlier grievance, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against Yale-New Haven Hospital.

The defendants filed an updated answer on May 18, 2001. They essentially admitted that the plaintiff was employed and then discharged, but they denied all allegations of wrongful conduct on their part and denied any actionable damage to her. In addition to denials, they asserted a number of special defenses, the only material one on which they offered evidence being failure to mitigate damages.

## FACTS

The general facts concerning the plaintiff's claims will be set forth. Further facts as found by the court will be contained in the discussion of each count or special defense.

The plaintiff is black.[1] She was graduated from high school in her hometown of Hemingway, South Carolina, in 1967. She attended junior college in Rock Hill, South Carolina, for one year. Then she moved to Connecticut. In 1968, she worked as a nurse's aide at the Hospital of St. Raphael in New Haven. On July 1, 1970, she began working at Yale University (university) as a clerical assistant in the catalogue card processing department

---

[1] The issue of race was raised by the plaintiff in her complaint. Several witnesses were asked to classify themselves or others by race, color or ethnicity. To simplify, the court will adopt the terms suggested by the plaintiff, "black" and "white," to refer to the commonly understood race and color groups at issue in this case.

of the university's libraries.[2] She was transferred among the library facilities while at the university and was promoted several times. Her performance evaluations while at the university always were satisfactory or better.

While a full-time employee at the university, the plaintiff held several part-time jobs. From 1976 to 1980, she worked part-time as an admitting officer at Yale-New Haven Hospital. In 1984, she did substitute teaching in the New Haven public schools. Beginning in 1985, she worked as a Realtor associate for Fort Hale Realty Company.

In June, 1986, she began attending the University of New Haven. She was awarded her bachelor of science degree in business administration and management science in January, 1988. She thereafter began attending graduate school part time. In August, 1993, she was awarded a master's degree in business administration from the University of Hartford.

In September, 1988, the plaintiff applied for employment at Yale-New Haven Hospital. She went through three interviews: first, with Rocco A. Lapenta, who worked for the hospital as a personnel representative-recruiter; second, with Patricia Hannon, who was a supervisor in the unit service management department; and third, with Norman Roth, who was in charge of the materials management department of which the unit service management budget was a part. The plaintiff was hired effective June 19, 1989, for a position as a

[2] One of the documents that make up exhibit two indicates that the plaintiff was actually hired for the position on September 1, 1969, but then took a leave without pay on September 15, 1969, and returned from that leave on July 1, 1970. Another document contains a performance evaluation of the plaintiff, dated November 17, 1969, for the first few months of her new employment. Whichever is correct, at least from the date of July 1, 1970, the plaintiff worked for the university without any significant break in service for the next nineteen years.

unit service manager at a gross annual salary of $31,000, plus benefits. Her status was to be probationary during her first six months of employment.[3]

The unit service management department was in charge of maintaining most nonnursing functions on patient care units. That included a variety of activities, such as ordering and maintaining inventory levels of supplies of all kinds, from hospital beds to bandages, assigning charges to patient charts for use of consumable supplies, overseeing the cleanliness of patient care areas and transporting patients. The plaintiff was assigned to manage one or more units. Her duties included supervising unit service assistants who performed the functions of stocking supplies and the like.

The plaintiff's performance was the subject of an annual performance appraisal. For the year June, 1991, to June, 1992, her management employee performance appraisal was authored by her immediate supervisor at the time, Charlie Wilson. Her overall performance score, on a scale of two at the unsatisfactory end to fifteen at the superior end, was seven, indicating that her performance was "below expectations." Chief among Wilson's criticisms of the plaintiff were her management skills. She missed deadlines for filing certain reports, assigned personnel in such a way that one unit ran over budget on salary, maintained a disorganized inventory system for one program and maintained poor communication with the nurse managers on her units with whom coordination was crucial. Wilson noted that the plaintiff's performance had sharply declined from

---

[3] The plaintiff's initial probationary period at Yale-New Haven Hospital was not her first experience with probationary employment. While employed at the university, she was transferred and promoted from the job of binding services assistant IV at Kline Science Library to library services assistant IX at Sterling Chemistry Library. Her new supervisor or department head completed a trial period performance evaluation form indicating satisfactory completion of her first thirty days on the job. The plaintiff signed that form.

that of the previous year. Her poor performance in areas of "top priority and importance" had a "very detrimental effect on the department's overall performance and reputation."

With the approval of his supervisor and a representative of the human resources department, Wilson placed the plaintiff on a ninety day special performance review status so that her work would be closely monitored. The plaintiff was notified in writing that if her performance did not show "immediate and sustained improvement," she was subject to disciplinary action up to and including discharge. The plaintiff received a copy of that performance appraisal on October 13, 1992, but refused to sign an acknowledgment of receipt.[4]

Patricia A. DeWitt replaced Wilson as the plaintiff's supervisor in October, 1992. Within one month, DeWitt had come to the conclusion that the plaintiff was not showing any improvement, and that allowing the plaintiff to retain the position for the full ninety days of the special review period would not make a difference and was likely to damage the credibility of the entire unit service management department. On November 18, 1992, DeWitt sent a memo to Wilson, who had been promoted to director of nursing administrative services, recommending that the plaintiff be removed as a unit

---

[4] As was the practice in completing all management employee performance appraisals, the plaintiff had a face-to-face meeting with her supervisor, was allowed to review a draft of the written performance appraisal and was invited to comment on it orally or in writing before it became the final formal appraisal placed as a permanent document in the employee's personnel file. There was evidence that the purpose of allowing an employee to comment on an initial draft was to provide the supervisor with an opportunity to correct any mistakes or, indeed, to rethink the evaluation with the potential for a different outcome. The plaintiff has presented evidence that on at least one occasion, the comments of another management employee whose performance was being appraised led to changes in the final draft and final performance score on one of his performance appraisals. The court finds nothing unusual or nefarious about such an approach and does not find from such evidence that the plaintiff was subjected to any different procedure.

service manager. Wilson concurred and referred the matter to Art McComb, administrative director for employee relations, who would be involved in such a discharge. No action was taken to remove the plaintiff at that time, however.

The plaintiff's next written performance appraisal, for the period through June 14, 1993, was completed on February 7, 1994. It, too, was below expectations, but once again no action was taken to terminate her employment or to remove her to a position of lesser responsibility in the hospital.

In October, 1994, the plaintiff's performance appraisal for the period ending June 13, 1994, rated the plaintiff in the "met expectations" range. That was true again for the performance appraisal period ending June 12, 1995. During those two years, the plaintiff's assigned duties had undergone some substantial changes because of an impending hospital wide staff reorganization.

The patient focused operational redesign (redesign) was instituted through the years 1993 through 1995 to cut operating costs and to increase staff efficiency. The entire unit service management department was phased out. The essential job functions of employees of that unit were, to some extent, combined with others; some were eliminated and others reclassified. The position of unit service manager was eliminated.

To lessen the adverse human resources impact of such a restructuring, many nonmanagement employees were to be retrained to qualify for new positions. Employees whose positions were eliminated under the redesign restructuring were given preference in transferring into new jobs. Those who chose not to apply for a transfer, or who were not qualified for a new

position, were given a more attractive layoff package than was available to other employees.[5]

The plaintiff retained the title of unit service manager during the staff restructuring, although some of her duties changed. During that period, she was utilized less as a manager and more as a trainer for some of the redesign affected employees who needed to learn additional or different job duties. She also worked on several special projects, such as implementing the relocation of one unit, that did not require substantial discretionary management responsibilities. As one whose job was to be eliminated under the redesign restructuring, it was expected during that time that the plaintiff would bid on transfers to other hospital positions for which she was qualified, look for outside employment or prepare to take the layoff package.[6] By early 1995, the plaintiff had taken few steps to do any of those things. Finally, in the summer of 1995 when the plaintiff was on notice of layoff, she applied for the posted position of coordinator.

The coordinator job posting stated that the requirements were, at a minimum, an associate's degree in business or equivalent experience, three to five years as an office manager and a like period of experience with PC networks, a proficiency at managing databases and excellent managerial skills. The plaintiff was one of nearly one dozen candidates for the position. A committee of four, of whom Cooney was one, screened the

---

[5] There was a special concern that the redesign restructuring might have an adverse impact on minority employees at the hospital. There was no occasion in this case to determine whether that was or was not so because the plaintiff's complaint raised race discrimination on the basis of disparate treatment, not on the basis of disparate impact. Accordingly, the court excluded proffers of evidence that seemed to veer into that area.

[6] All of the other unit service managers elected one of those alternatives. Those who remained with the hospital transferred into jobs that were no longer classified as management jobs, that had no supervisory responsibility for any personnel and that were at least one labor grade lower.

applications and selected candidates to interview. The committee chose four candidates as the top of the group from among those interviewed. It ranked them in order and sent those names to the human resources department for the job offer to be made. The plaintiff was not among the top four, and, as far as Cooney was concerned, was not even in the running because of her past difficulty as a manager.

When the plaintiff learned that she had not been chosen to fill the job, she filed a grievance with Yale-New Haven Hospital's human resources department.[7] The grievance was grounded on the hospital policy of giving preference in transfers to those employees, like the plaintiff, whose jobs had been eliminated under the redesign reorganization. The plaintiff claimed that she fulfilled the minimum qualifications for the coordinator position and therefore was entitled to preference over all other candidates. Among those who supported the plaintiff's policy interpretation was Johnson.

The grievance was decided by Diana J. Weaver, senior vice president for patient services. The plaintiff's grievance was sustained. The plaintiff was appointed to the position of coordinator. She was officially notified of the terms of her transfer on November 28, 1995, by letter from Lapenta, although she had been informally notified in mid-October of the success of her grievance. The plaintiff was to be paid an annual salary of $37,500 and to have a probationary period of six months.

The appointment made Cooney exceedingly unhappy. In his view, the hospital policy of favoring a minimally qualified candidate over candidates whom he viewed as superior undermined the delivery of high quality patient care for which the center was known. Cooney was particularly concerned because he had

---

[7] Yale-New Haven Hospital made available an internal, nonunion grievance policy to its employees.

become aware that the plaintiff had in the past received low performance appraisal scores. Cooney let Weaver and Johnson know in no uncertain terms about his displeasure.

Nonetheless, once the plaintiff was appointed to the position, everyone resolved to make the best of it. In an effort to ensure that the plaintiff succeeded at the new job, Weaver enlisted Suzanne Boyle, a registered nurse and an experienced manager who was a special projects coordinator in patient services, to be a mentor to the plaintiff. Cooney retained Betty McLellan, the previous coordinator,[8] to return to the hospital to orient the plaintiff on the day-to-day operations of the center and to train her in the specific computer programs that the center used.

The plaintiff met on several occasions with McLellan before the effective date of transfer—December 4, 1995—to begin the transition process. The plaintiff also used that time to take three in-house computer courses to improve her computer skills.[9] The staff at the center,

[8] McLellan had left the position of coordinator at the center to form a consulting business with a physician, Ronald Miller, who, from 1987 to July, 1995, had been the medical director of the center. Cooney was filling Miller's position on an interim basis until a permanent medical director could be hired.

[9] An issue raised by the plaintiff in this lawsuit was the alleged failure or refusal of Yale-New Haven Hospital to provide her with training in the administration of a local area network (network) computer system. There was no such failure on the hospital's part. Knowing that one of the responsibilities of the new position was to be the network administrator for the center's stand-alone computer network, the plaintiff took no steps to use that time to enroll in any network courses inside or outside the hospital. At no time until after her removal from the position did the plaintiff bring to anyone's attention that she desired any such training. At no time did she seriously investigate obtaining such training. She consistently held herself out as having all the required computer skills for the job. Moreover, the performance deficiencies that led to her dismissal were not ones that materially related to any lack of computer skills.

which had been dividing the duties of the vacant coordinator position for several months, was pleased and relieved to have the plaintiff join the staff.

The center was an outpatient facility that provided a comprehensive, multidisciplinary approach to the diagnosis of the health problems of elderly patients. Patients, most of whom were referred through primary care physicians in the community, were brought to the center exhibiting a variety of medical needs that were usually beyond the ability of a single specialist to assess. The goal of the center was to accomplish a thorough workup of the patient to create a treatment plan for that person. The staff would receive the referral from a family member or primary care physician, a case manager would take an extensive history from a variety of sources, one or more physicians who were specialists in such fields as psychiatry, orthopedics, geriatrics or other relevant areas, would conduct the necessary physical or mental examinations of the patient, and that team would help design a treatment program with the patient, the family and the community physician. The center was a separate cost center at the hospital so that it needed to run efficiently and to keep up a steady census of patients.

The coordinator was responsible for the overall operation of the center. She had direct supervision over a small staff that, through most of the plaintiff's time there, consisted of one receptionist, one secretary and two part-time transcriptionists. The plaintiff worked with but did not supervise the four case managers on the staff. She coordinated the clerical work of the case managers and of the physicians who performed medical evaluations on the center's patients.

The plaintiff began to experience difficulty performing some of her job responsibilities right from the start. Within her first four weeks on the job, there were

occasions when telephone calls referring potential new patients did not receive follow-up and available appointment slots were not filled, reports and evaluations on patients were not sent in a timely manner to the patient's primary care physician,[10] incoming facsimile transmission were not delivered by e-mail or printout to the individual to whom they were addressed and patient charts had incomplete information. All of those were within the plaintiff's responsibility to oversee.

Cooney met regularly with the plaintiff to conduct oral discussions about her progress in the job. In addition, Cooney put in writing a series of interim evaluations of the plaintiff's performance and gave those memoranda to her. In a supervision meeting with her on December 29, 1995, Cooney gave the plaintiff the first of those memoranda. At that meeting, orally and in writing, the plaintiff received a detailed description of the inadequacies in her performance during her first four weeks on the job. Cooney told her that she must correct them to be successful.

Again on January 11, 1996, Cooney informed the plaintiff that she was not meeting performance expectations. In addition to continued delays in scheduling appointments for new patients about whom calls had been received and continued gaps in posting information to patient charts, Cooney noted other problems about which he told the plaintiff. There were inexcusable delays in transcribing dictation of reports and evaluations. The plaintiff was not referring initial telephone calls properly to a designated case manager. When the plaintiff covered the front desk, she did not type messages from incoming telephone calls directly into the computer system.

---

[10] The standard was that no more than one week should pass between the patient being seen and a letter being sent to the patient's primary care physician.

On January 19, 1996, Cooney once again provided a detailed explanation to the plaintiff of the deficiencies in her work. He explained that his information came from a number of the staff members of the center who had identified serious problems with the running of the center. He urged the plaintiff to become thoroughly competent at all aspects of the management of the center. He counseled her that if a task was not getting done, the plaintiff herself needed to do it, not simply look for someone to whom to delegate the task.

Cooney gave the plaintiff several examples of specific problems. When the receptionist was on a break or out for a day, the plaintiff assigned the transcriptionists to cover the front desk, even if they were behind in completing transcriptions. Three days earlier, when the front desk receptionist was too busy to return telephone calls to schedule patient appointments, Cooney had brought that to the plaintiff's attention with the expectation that she would follow-up immediately and do it herself. Instead, the plaintiff gave the list of telephone calls to the receptionist and left for the afternoon. The coordinator was assigned, among other things, to make corrections to transcriptions, fill out physician reimbursement reports and obtain information necessary to complete patient charts. The plaintiff consistently asked staff members with other responsibilities to carry out those tasks.

The plaintiff disagreed with Cooney's criticisms. For example, the plaintiff complained to Cooney that covering the front desk was in fact part of the job description of the transcriptionists. Cooney explained that the plaintiff needed to have a broader vision of the functioning of the center, to set an example for good teamwork and to provide leadership to the staff in all job descriptions. He also specifically directed her on a number of

occasions to cover the desk herself in a crunch, a directive that the plaintiff largely ignored and viewed as interference with her management prerogatives.

During the plaintiff's time at the center, the staff became increasingly dismayed at the decline in the center's functioning. That was of particular concern to the case managers who were physically located on the premises and who had the most contact with patients, families and community physicians. Cooney received regular complaints from the case managers about delays and disorganization at the center. Much of that information came to Cooney via e-mail, a common tool for communication among the staff. In meetings with the plaintiff, Cooney repeatedly told her of the staff's concern, and he shared many examples with her. On at least two occasions, he showed the plaintiff specific written communications he had received about work problems—one from Nanne Scholhamer, a case manager, and another from McLellan, whose new consulting business provided services to the center's computer system and who continued to be on retainer to assist in the transition of work to the new coordinator.

By mid-February, 1996, after having met regularly with the plaintiff to counsel her about her job performance and after having given her four written memoranda about specific areas that needed improvement, Cooney decided that her performance was so detrimental to the working of the center that something had to be done. He contacted Lina Perrotti, formerly Persky, the manager of employee relations, to ask what the alternatives were.[11] Perrotti's answer to Cooney was

[11] Perrotti, like Johnson, had been an advocate for the plaintiff when the plaintiff earlier had been passed over for the coordinator position. After the plaintiff had been working at the center for four or five weeks, Perrotti began to hear about the plaintiff's performance problems from both Boyle and Cooney. Perrotti advised them to speak with the plaintiff about the specific deficiencies, to communicate with the plaintiff regularly in an attempt to help her, and to document the plaintiff's problems and progress.

that the plaintiff was still in her probationary status and that he had the ability to release her[12] if her performance was inadequate. Cooney, with Perrotti's help, drafted a termination memo.

Cooney attempted to deliver the memo on February 28, 1996, but the plaintiff was on vacation until March 4. On March 4, the plaintiff received the memo, releasing her as of March 30, 1996. On March 7, 1996, the plaintiff filed a grievance.

The plaintiff also sought out Wilson, her former supervisor who then was the director of workforce diversity at Yale-New Haven Hospital, to ask if there was anything he could do to help her. Wilson was in charge of an employee mediation program known as consulting pairs, the purpose of which was to defuse conflicts between workers. Wilson approached his supervisor, Johnson, to inquire whether the plaintiff's problems in the center could be helped using the consulting pairs program. Wilson also told Johnson that the plaintiff was concerned that she had not been allowed the full six months of probation before being discharged. Because the plaintiff's problems in the center were performance related and because she already had been released and had filed a grievance, Johnson determined that there was no further counseling, mediation or other intervention that the hospital could provide appropriately. Johnson replied that Wilson should not become involved.

The plaintiff's grievance went once again to Weaver, the senior vice president for patient services. Weaver

---

[12] The termination section of the defendant's human resources policy and procedure manual defines "release" to mean a termination initiated by the hospital due to the inability of the employee to perform the duties of the position satisfactorily. The term "discharge" is defined to mean a termination initiated by the hospital for violation of the employee conduct and discipline policy. The court, however, uses the terms "termination," "discharge" and "release" interchangeably throughout this memorandum without regard to their usage in the human resources policy and procedure manual.

conducted a full investigation and determined that there was no merit to the plaintiff's contention that she had been unfairly evaluated.

The plaintiff then took her grievance to the next step, where she was entitled to elect that it be heard either by a panel of employees or by Marna P. Borgstrom, the executive vice president and chief operating officer for the hospital. The plaintiff chose the latter. After a thorough investigation that included an interview of the plaintiff and persons suggested by the plaintiff, interviews of persons connected to the center and a review of documents related to the plaintiff's performance, Borgstrom denied the plaintiff's grievance and upheld the termination.

Both Weaver's and Borgstrom's decisions included an offer to allow the plaintiff to try to transfer as an internal candidate, giving her preference over outside applicants, to any other open positions in the hospital for which she was qualified. Borgstrom's decision also allowed the plaintiff the option, otherwise expired, of choosing the redesign related severance package. The plaintiff declined and eventually filed this lawsuit.

I

COUNT ONE—BREACH OF IMPLIED CONTRACT
AGAINST YALE-NEW HAVEN HOSPITAL

The plaintiff alleged in count one that she and the hospital had an oral contract of employment for an indefinite term. Such contracts are recognized in Connecticut law and construed as terminable at will. *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987). The plaintiff alleged that in addition to terms incorporating an agreement about type of job, wages and hours, her employment contract with the defendant incorporated the provisions of the hospital's

employment manual. The provisions of the manual that allegedly were breached by the defendant were alleged in the complaint as follows:[13]

Paragraph 20a. The plaintiff's discharge was wrongful because the plaintiff "properly and diligently performed her duties under the work agreement" (The court reads that as a claim that the plaintiff could be discharged only for just cause.);

Paragraph 20b. The defendant did not provide the plaintiff "the benefit of retraining and education as required under the work agreement" to aid in her transfer to the coordinator position;

Paragraph 20c. The defendant discharged the plaintiff because of "disparate treatment based on racial considerations";

Paragraph 20d. The defendant was discharged in "violation of Section III of the manual entitled 'Staff Selection Guidelines' in that plaintiff was not accorded fair and equitable treatment in accordance with said guidelines"; and

Paragraph 21. The defendant failed to provide the plaintiff with "a full opportunity to complete the six month training and re-education program as provided [in] the guidelines."

In count one, the plaintiff alleged reliance on, variously, the hospital's manual for her claim of breach of contract. The evidence suggests three sources from which the plaintiff has derived the terms of any such contract.

---

[13] The allegations all seem to be repeated, albeit in slightly different language, in paragraph twenty-two of the complaint, which alleged that the defendant's conduct was arbitrary and that it lacked good faith. The court is unable to read paragraph twenty-two as adding anything to that already alleged in paragraphs twenty and twenty-one.

A

### Human Resources Manual

Yale-New Haven Hospital does have an extensive human resources policy and procedure manual. The portions of it that relate to the plaintiff's circumstances are the introductory section,[14] the section on orientation period policy, terminations and performance appraisal-management and professional employees.

The plaintiff claims that the relevant sections of the manual constituted essential terms of her employment contract with the defendant. The court finds, however, that the plaintiff has failed to prove that by promulgating the manual, Yale-New Haven Hospital agreed to undertake some form of actual contractual commitment. See *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 15, 662 A.2d 89 (1995). The manual was not a statement of promises made to the plaintiff or to any other employee, but rather a written description of how the defendant expected its human resources to be deployed.

Moreover, at the time the plaintiff applied for the transfer to the coordinator position, the manual contained clear language disclaiming that it represented a contractual commitment.[15]

[14] The defendant changed certain of its policies and procedures from time to time, and sections of the manual were updated, changed and circulated accordingly. The introductory section, entitled eponymously "Human Resources Policy and Procedures Manual," is one whose effective date was April 1, 1995, replacing an earlier version in effect since January 1, 1991. Thus, the version of that section that was in effect at the time of the plaintiff's initial hire by the defendant is not in evidence.

[15] There is no evidence of whether the disclaimer language was included in the version of the manual in use at the time of the plaintiff's initial hire, although the court does not understand the plaintiff to claim that the manual in existence at the time of her initial hire differed in any substantial way from that in use at the time of the events of which she complained.

As to the particular provisions of the human resources policies utilized in the case of the plaintiff, even if there were a contractual commitment by the defendant to the plaintiff, the defendant did not breach any such commitment to the plaintiff.

(1) Dismissal for Just Cause: The first breach of contract claim is that the human resources manual obligates the defendant to dismiss an employee only for just cause. There is no such language in the sections of the manual in evidence in this case. There also is no any credible evidence that other parts of the manual contain such an obligation.[16]

(2) Failure to Provide Training: The sole mention of training in the relevant manual sections is in that entitled orientation period policy, which defines that period as a time during which an employee is "oriented and trained to perform the duties required for his/her new position." There is no language further defining what type or amount of training might be appropriate or any language obligating the defendant to provide such training. Such vague terminology cannot support a claim for breach of contract here.

(3) Race Discrimination: The plaintiff's claim of race discrimination will be discussed in part X.

(4) Violation of Staff Selection Guidelines: The staff selection guidelines are contained in the redesign guidelines and will be discussed in part I B.

(5) Failure to Allow Plaintiff the Full Six Month Probation Period: The orientation period policy, designated policy number C:4, states: "During the orientation

---

[16] The plaintiff made no claim that the defendant failed to carry out the grievance process as described in the manual. Indeed, that part of the manual was not admitted as evidence. The plaintiff testified that the defendant complied with the grievance process, but that she believed the outcome was unfair.

period, any employee who has been counselled [sic] and advised of job performance deficiencies may be released or discharged without further notice after a reasonable time has been allowed for action to correct the deficiencies."

The plaintiff was counseled by Cooney, advised of job performance deficiencies and released after a reasonable time had been allowed for her to correct the deficiencies. There was no obligation to allow the plaintiff further time to master the position. The policy does not mandate that an employee is entitled to serve out the entire probationary period.

B

Redesign Guidelines

Yale-New Haven Hospital also developed the document called human resources guidelines for patient focused operational redesign. The contents of that twenty-six page document seem to be the true focus of the plaintiff's claim to contractual responsibilities of the defendant in counts one and two. Those guidelines contain specific contract disclaimer language on the very first page of the text: "Please note these procedures are guidelines only and are subject to revision by the Hospital. They are not intended to create a contract." As to employment security, the guidelines state: "The Hospital will make every reasonable effort to place an employee whose job is eliminated or modified by the work redesign process. However, the Hospital cannot guarantee a job placement . . . ." The redesign guidelines did not constitute a part of any contract with the plaintiff.

As with the main human resources policy, even if there were a contractual commitment created by the redesign guidelines, the defendant did not breach any such commitment as claimed by the plaintiff.

(1) Dismissal for Just Cause: Nothing in the guidelines speaks at all to the issue of dismissal or termination except by layoff. There is no language that can be remotely construed as requiring only just cause terminations.

(2) Failure to Provide Training: Although the guidelines indicate that training will be provided to affected employees, they do not specify any particular type or amount of training. They describe how the human resources department is to coordinate "training referrals" and "[c]oordinate employee's needs with training, as necessary." But that does no more that delineate which department is responsible for such a function. Later, the guidelines state: "Once employees are selected for positions resulting from the [redesign] process, they will undergo training, as needed, to learn the skill/competencies required for the new position."

The coordinator job was not a position resulting from the redesign process. The coordinator position did not have any new or special training connected with it. To the extent other unit service managers moved into other jobs, they received no special training, but only job orientation as any transferred employee would.

But more substantively, the plaintiff was provided with the opportunity for plenty of training. When she applied for the coordinator job in July 21, 1995, she knew there were additional skills she would need to learn for it, chief among them the particular computer program used by the center and the ability to do local area network (network) administration. As to the latter, in the hiatus between learning that she was likely to be awarded the position and her actual start date, she did absolutely nothing to enroll in a network administration course or even to investigate the circumstances of doing so. Only after she received her notice of release did she actually ask for and obtain a course list for

such training. As to the other computer skills, she had the services of McLellan, the former coordinator at the center who was an expert in the center's Lotus Notes program. In fact, McLellan's new business involved servicing and providing technical support for that computer program. As Cooney described McLellan, she was the "master" of knowledge in that area who had helped set up the program and had taught everyone in the center to use it. There was no better training available anywhere. The plaintiff did not take advantage of the opportunity to learn those special skills from McLellan.

As for any management skills that were peculiar to the center, there was no special training for that. What was provided to the plaintiff were the services of Boyle, an experienced manager who could work with the plaintiff whenever necessary to help her. The plaintiff, however, did not view the on-the-job services of McLellan or Boyle, or the guidance of Cooney and the plaintiff's other coworkers, as "training." As a result, she dismissed their good faith efforts to assist her to learn all the necessary new skills for the job. The defendant provided training that was more than adequate for the plaintiff, even though it had no contractual obligation to do so.

(3) Race Discrimination: The plaintiff claims that the redesign guidelines obligated the defendant not to discriminate against her on account of race. In the section on staff selection guidelines, there is indeed language that states: "As with all Hospital employment practices, consideration will not be denied to an applicant based on race, age, gender, color, religion, national origin, veteran status or disability. In cases where [there are] two or more applicants with relatively equal qualifications for a position, the Hospital's commitment to affirmative action requires that additional consideration must be given to an individual from an underutilized

group as a consideration factor in addition to his or her other qualifications."

But that does no more than state a policy. It does not constitute a contract. Even if it were a contract, the defendant's conduct did not constitute race discrimination. See part X.

(4) Violation of Staff Selection Guidelines: The plaintiff specifically pleaded that her discharge resulted from a violation by the defendant of the staff selection guidelines section of the redesign guidelines. It is unclear what she meant by that. The section on staff selection guidelines describes how staff members whose positions were eliminated would be selected for other jobs. The plaintiff was selected for another job, albeit after filing a grievance. If what the plaintiff meant in paragraph 20d of count one by a denial of "fair and equitable treatment in accordance with [this section of the] guidelines" was that her grievance was held against her, she could certainly have pleaded that with greater specificity. But reading paragraph 20d as a claim that those guidelines prohibit retaliation against an employee for the manner in which she was selected for a new job, the fact is that the guidelines say no such thing. Although fairness might dictate that the defendant ought not do so, there is no contractual undertaking in that section of the guidelines or anywhere else to select a particular employee for a position, to assist that employee to be successful in any such position or to treat that employee in a particular way according to how the employee obtained the position.[17]

(5) Failure to Allow Plaintiff the Full Six Month Probationary Period: As to any obligation regarding a probationary period, the guidelines provide for no other

---

[17] To the extent that what the plaintiff was claiming is the breach of an implied covenant of good faith and fair dealing in the employment contract, that is treated in part I D.

policy than that contained in the regular human resources policy, referring specifically to policy C:4, which was discussed in part I A.

## C

### Statements of Lapenta

The only other source from which the plaintiff claims that the defendant's implied contractual obligations emanate are the statements of Lapenta, a hospital personnel representative with whom she had an initial employment interview at least six years before the events of which she complains.

The plaintiff's recollection was that during her discussions with Lapenta in 1989, the plaintiff inquired about how secure she could expect a job at Yale-New Haven Hospital to be. Lapenta told the plaintiff that to his knowledge, the hospital was not contemplating any layoffs in the near term.[18]

That was not a misstatement of fact, nor was it a binding promise. Lapenta did not have authority to establish or to modify hospital policy, nor did the plaintiff believe him to have such authority at the time. He had no authority to bind the hospital to any contract with the plaintiff except for the at-will employment

[18] The court does not credit the testimony of the plaintiff that Lapenta made any representations about the termination policy of the defendant. In describing her conversation with Lapenta, the plaintiff gave inconsistent testimony. At one point, the plaintiff quoted Lapenta as saying that as long as one adequately performed one's job, the threat of being discharged was likely only for offenses such as theft, insubordination or sexual harassment. At another time, the plaintiff said Lapenta described the disclosure of confidential patient information as a ground for termination. At her deposition, she testified that Lapenta had stated that "you wouldn't have to worry . . . unless you did something horribly wrong." Even if Lapenta did describe such scenarios, they are a fair characterization of hospital policy, but they are irrelevant to the plaintiff's situation because she was discharged during a probationary period for not performing her job adequately. The plaintiff always knew that inadequate job performance was a ground for dismissal.

contract, the terms of which were contained in his initial letter offering her the unit service manager job. The plaintiff did not understand at the time that any rights, contractual or otherwise, other than an at-will employment arrangement were being offered to her. The plaintiff understood at the time she accepted the position and thereafter—from the statements of Lapenta during the interview process, from her previous job experience at the university, and from the orientation material and other information[19] she received shortly after being hired—that her employment could be terminated at any time, particularly if the hospital determined that she was not performing her job adequately.

Although oral statements as well as written ones can be the basis for an employer's contractual obligations to an employee; see *Torosyan* v. *Boehringer Ingelheim Pharmarceuticals, Inc.*, supra, 234 Conn. 16, 19; the court does not find that any oral statements made by Lapenta formed the terms of a contract here.

D

Good Faith and Fair Dealing

Although the court does not find that the human resources manual, the redesign guidelines or the statements of Lapenta supply any additional contract terms, the plaintiff clearly had a contract of employment at will with Yale-New Haven Hospital. The plaintiff claimed in paragraph 22d of count one that she had a right to expect that the employment relationship would be governed by the concept of good faith and fair dealing that is implicit in every contract. That is a proposition that likely is true; see, e.g., *Daley* v. *Wesleyan University*,

---

[19] Within the first two weeks of her employment, the plaintiff attended a new employee orientation session in which various hospital policies were explained. She was given documents that described many of those policies. Because she held a management position, she was required to become familiar with the personnel policy in particular. Nothing in those policies conflicted in any way with what Lapenta had told her.

63 Conn. App. 119, 127, 772 A.2d 725, cert. denied, 256 Conn. 930, 776 A.2d 1145 (2001); but for which the plaintiff provides no legal support. It has not been referred to separately in any of the plaintiff's legal memoranda. Although it was pleaded as a "concept," it was tied to no specific conduct of the defendant.

The interpretation of pleadings is always a question of law for the court. *Cahill* v. *Board of Education*, 198 Conn. 229, 236, 502 A.2d 410 (1985). The court must attempt to construe the language in the plaintiff's pleadings to ascertain what the plaintiff is complaining about. "Whenever that language fails to define clearly the issues in dispute, the court will put upon it such reasonable construction as will give effect to the pleadings in conformity with the general theory which it was intended to follow, and do substantial justice between the parties. . . . But essential allegations may not be supplied by conjecture or remote implication." (Citation omitted; internal quotation marks omitted.) Id.

The only thing the court can think of that is not already the topic of a more precise allegation is in relation to the general retaliation claim of the plaintiff: that after she successfully grieved the hospital's failure to select her for the coordinator position pursuant to the staff selection section of the redesign guidelines, the hospital set out to get rid of her by unfairly evaluating her performance at her new job. That might indeed state a cause of action for breach of a covenant of good faith and fair dealing under an implied contract theory.

The problem is that the court does not find that proved. The court credits the testimony of Cooney and others that, despite the disappointment at not having one of the superior candidates appointed to the post, all involved resolved to make the situation work, to support the plaintiff in an effort to have her succeed,

and to treat her well and to evaluate her fairly in her new job. No retaliation occurred.

The court finds no merit to the plaintiff's claims of breach of an implied contract.

## II

### COUNT TWO—BREACH OF EXPRESS CONTRACT AGAINST YALE-NEW HAVEN HOSPITAL

The plaintiff claimed in count two that she had an express contract with the defendant that consisted of the relevant portions of the redesign manual. She claimed that the hospital breached that contract on the following grounds:

Paragraph 32a. The hospital did not make a good faith effort to reassign her to a position comparable to the one that she formerly held prior to the restructure process;

Paragraph 32b. The hospital did not retrain and reeducate her for her new position;

Paragraph 32c. The hospital did not provide her with the six month training period as required by the manual;

Paragraph 32d. The hospital did not provide her with the benefits of the hospital's affirmative action guidelines; and

Paragraph 32e. The hospital did not pay her the sums due her under the voluntary-involuntary layoff process.

The evidence supports none of those claims.

First and foremost, the court reiterates its finding that the manual entitled human resources guidelines for patient focused operational redesign did not create any additional contract terms between the hospital and the plaintiff. Beyond that, the specific claims of the

plaintiff that the hospital failed to carry out the redesign policies are without merit.

As part of the redesign process, an employee whose job was to be eliminated was not simply reassigned to another job. That employee had to identify and to apply for any jobs to which she wanted to transfer, as the plaintiff did for the coordinator position. After the plaintiff was released from the coordinator position, she continued for a time to be eligible to apply as an internal candidate for placement in other hospital jobs. There is evidence that the plaintiff expressed to Perrotti interest in several jobs, but there is no evidence that the plaintiff ever filed an actual job application for any new position at the hospital after March 5, 1996. Contrary to the claim in paragraph 32a, there is no evidence that the hospital had an obligation to "reassign" the plaintiff to any particular position or that the hospital interfered with the redesign process in her case.

As has been discussed, the plaintiff's claims in paragraphs 32b and 32c of lack of adherence to the training and the orientation period policies are not supported by the evidence.

As to the claim in paragraph 32d that the defendant did not provide the plaintiff with the benefits of the affirmative action guidelines in the redesign manual, there is no specific entitlement in that section of the redesign manual to any particular benefit. The commitment not to discriminate on the basis of race, contained in that section of the redesign guidelines, was not violated.

As to the claim in paragraph 32e, there was no evidence concerning the failure to pay layoff benefits, and the court is under the impression that this claim was withdrawn.

## III

### COUNT THREE—TORTIOUS INTERFERENCE WITH CONTRACT AGAINST COONEY

The court dismissed count three under Practice Book § 15-8 at the close of the plaintiff's case-in-chief. Cooney was alleged at all relevant times to have been a hospital administrator, an employee of the defendant and a supervisor at the geriatric clinic. There was no allegation that he was acting outside the scope of his employment during any relevant time, nor does the evidence so suggest.

An agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his corporate principal to breach a contract between his principal and a third party because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract. *Wellington Systems, Inc.* v. *Redding Group, Inc.*, 49 Conn. App. 152, 168, 714 A.2d 21, cert. denied, 247 Conn. 905, 720 A.2d 516 (1998), citing *Boyce* v. *American Liberty Ins. Co.*, 204 F. Sup. 317, 318 (D. Conn. 1962). The plaintiff concedes that to be a correct statement of the law. The plaintiff has failed to plead or to prove that Cooney was acting outside the scope of his employment. Therefore, the claim must fail.

## IV

### COUNT IV—TORTIOUS INTERFERENCE WITH CONTRACT AGAINST JOHNSON

The plaintiff alleged in count four that at all relevant times, Johnson was a hospital administrator and the vice president of employee relations. As with count three, the plaintiff has failed to plead or to prove that Johnson was ever acting outside the scope of his

employment in his conduct toward her. The court therefore dismissed that count under Practice Book § 15-8 at the close of the plaintiff's case-in-chief.

## V

### COUNT FIVE—FRAUD

The plaintiff alleged in count five that from 1989 to 1996, the hospital made representations "that it would fairly and equitably apply all manual policies and procedures to her" while it "deliberately, outrageously and maliciously concealed its true intent," that being to induce her to reject other job offers and to remain as a hospital employee despite the lack of job security.

The elements of fraud are (1) that a false representation was made as a statement of fact, (2) that it was untrue and known to be untrue by the party making it, (3) that it was made to induce the other party to act on it and (4) that the latter did so act on it to his injury. *Miller* v. *Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811 (1981). Moreover, fraud is not to be presumed, but must be proven by clear and satisfactory evidence, rather than by a mere preponderance. Id., 55.

The plaintiff has failed to prove that any false statement of a material fact was made to her by anyone. In particular, the plaintiff has sought to prove that Lapenta made false statements at her initial interview in 1989. The court finds that Lapenta made no such statements. He did not say that employees could be discharged only for just cause. To the extent that Lapenta made general statements about the lack of impending layoffs or about the reputation of Yale-New Haven Hospital as an employer, those did not constitute statements of fact as opposed to opinion, and none was false at the time it was made. Lapenta also did not believe any such statement he made to be false.

Most especially, such reliance as the plaintiff did place on any statement made by Lapenta was not to her detriment. Rather, any belief that she formulated that the hospital would utilize a set of well defined policies and procedures before undertaking an adverse job action against her was amply and demonstrably carried out in the plaintiff's case. The plaintiff has failed to prove fraud.

VI

COUNT SIX—PROMISSORY ESTOPPEL AGAINST YALE-NEW HAVEN HOSPITAL

The plaintiff claimed in count six that under the doctrine of promissory estoppel, she was entitled to enforce promises of job security that were made to her by the hospital. Recognized in the employment context in *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* supra, 202 Conn. 213, that doctrine is an alternative to a claim sounding in contract. The doctrine recognizes those situations in which a defendant's liability ought to exist because the plaintiff undertook some action that was "induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor . . . ." (Citation omitted; internal quotation marks omitted.) Id., citing Restatement (Second), Contracts § 90 (1973).

The plaintiff does not identify in her complaint the specific source of the promise she claimed that the hospital made, only that "promises" were made to her "[b]y and through the words, acts and conduct of hospital and its agents and representatives, as well as its written policies . . . ." But whatever the source, a "fundamental element of promissory estoppel . . . is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* supra, 202 Conn. 213.

In her brief, the plaintiff cites two sources for such a promise. The first, again, was Lapenta, and the second was the text of the redesign guidelines. The court finds that nothing Lapenta said was "sufficiently promissory nor sufficiently definite to support contractual liability." Id., 214. A statement that an employer is not presently planning any layoffs does not constitute a binding promise to a particular employee not to lay off that employee at some point in the future.

The relevant portions of the redesign guidelines do not contain any such language as would invite reliance by the plaintiff. They describe the defendant's policy of providing general training and support to displaced employees, but no such language is sufficiently precise to support liability for not having provided specific kinds of services to the plaintiff.[20]

## VII

## COUNT SEVEN—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

The court dismissed count seven under Practice Book § 15-8 at the close of the plaintiff's case-in-chief. The

[20] In her brief, the plaintiff seems to claim that she should prevail on a promissory estoppel theory because she was forced to utilize the hospital's grievance procedure to obtain the coordinator job in the first place, a procedure that would not have been necessary if the hospital had complied with the redesign guidelines. The problem with that is that she was successful in that grievance so that she can prove no injury.

As to her second unsuccessful grievance, the court need not discuss whether any actual grievance procedures described in the human resources manual or in the redesign guidelines give rise to a promissory estoppel claim. That is so because the plaintiff has made clear that it is not her claim that the hospital failed to follow the grievance procedure properly. Her challenge is not to the procedure that was utilized, but rather to the outcome. Her claim is that Cooney unfairly evaluated her work so that he could support a decision to release her, no matter what kind of grievance procedure she may have been entitled to use. Moreover, the plaintiff did not offer in evidence the written grievance policy of the hospital from the human resources policy and procedure manual, so the court would have no basis on which to determine whether the hospital properly applied it.

elements of a claim of intentional infliction of emotional distress are the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Id.

In this case, the plaintiff neither pleaded nor proved any conduct by the defendants that could remotely be described as extreme or outrageous. Her evidence, if believed, established only that there were several loud, unpleasant meetings, that on one occasion Cooney banged his fist down on a table and that on another occasion he tossed papers in her direction. Conduct on the part of a defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based on intentional infliction of emotional distress. Id. Accordingly, the court dismissed that count.

VIII

COUNT EIGHT—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

The plaintiff alleged in count eight that her discharge "was done in an inconsiderate, humiliating and embarrassing manner" and that this constituted negligent infliction of emotional distress. The tort requires that the plaintiff plead and prove that a defendant knew or should have known "that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in

illness or bodily harm." (Internal quotation marks omitted.) *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 173, 530 A.2d 596 (1987), citing *Montinieri* v. *Southern New England Telephone Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978).

It is unquestionably true that a job loss, whatever the cause, can result in emotional distress. The plaintiff has failed to prove that any conduct of the defendants created an additional risk that she might suffer an actual illness. Her discharge was handled with formality and with as much courtesy as was possible under the circumstances. Her claim that the termination created an unreasonable risk of such distress is without merit.

## IX

## COUNT NINE—VIOLATION OF FAIR EMPLOYMENT PRACTICES ACT, § 46a-60 (a) (1)

This claim in count nine was dismissed on a motion to dismiss for lack of subject matter jurisdiction before the commencement of trial.

## X

## COUNT TEN—VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e ET SEQ.

The plaintiff claimed in count ten that she was the victim of race discrimination and that her release from the job of coordinator for poor performance was a pretext. She alleged that she consistently performed her job in a competent manner.

To establish a prima facie case of race discrimination on the basis of disparate treatment, the plaintiff must show that she was a member of a protected class of persons, that she was qualified for the position, that she was discharged and that her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See *McDonnell Douglas*

*Corp.* v. *Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). That standard is not inflexible, as "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect in differing factual situations." Id., 802 n.13; see also *Texas Dept. of Community Affairs* v. *Burdine,* 450 U.S. 248, 260, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

If the plaintiff is able to make out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for her dismissal. See *McDonnell Douglas Corp.* v. *Green,* supra, 411 U.S. 802. If there is proof of such a reason, the plaintiff, to prevail, must show that the stated reason was a pretext for the underlying "true" reason, that of race discrimination. Id., 804. The purpose of the shifting burden is not formulaic. The ultimate question is always "discrimination vel non." *United States Postal Service Board of Governors* v. *Aikens,* 460 U.S. 711, 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983).

The plaintiff correctly points out in her brief that her proof ought to be reviewed by the court in light of the difficulty of establishing direct evidence of discrimination, noting that defendants "are rarely so cooperative as to include a notation in the personnel file" that their actions are discriminatory in nature. *Ramseur* v. *Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir. 1989), citing *Thornbrough* v. *Columbus & Greenville Railroad Co.,* 760 F.2d 633, 638 (5th Cir. 1985). Especially with respect to pretext, the court has paid particular attention to the witnesses who wrote unsatisfactory performance appraisals of the plaintiff's work, both before and after her placement in the coordinator position. Because the management skills of the plaintiff were the subject of criticism in the hospital's files over a number of years and because those kinds of skills are particularly susceptible to subjective evaluation, the validity of those

criticisms was of special interest to the court. The credibility of those who authored such criticisms was of special interest to the plaintiff as well and, in her argument, she encouraged the court to view that testimony carefully.

The plaintiff has failed to make out a prima facie case of race discrimination. She has failed to prove that the circumstances of her discharge raise an inference of race discrimination.

The plaintiff's prima facie case consisted of the evidence that (1) she is a black female, (2) she was the only black person who was assigned at the time to the center, (3) her supervisor, Cooney, was white and (4) after she was released, the job was reposted and a white female eventually was selected to fill the position.

The plaintiff also emphasizes the existence of disparaging "secret memos," which were sent by white staff members to Cooney, to raise the inference that there was something pernicious or unlawful going on. She believes those memos were orchestrated by Cooney so that he could create a "paper trail" documenting a poor performance record, and so that he could discharge the plaintiff and install a favored white candidate in her stead. She argues that Cooney, to that end, "micromanaged" her performance of the job in a way he did not with the previous or subsequent white coordinators. She asserts that Cooney did not even use the proper procedure in evaluating her performance because he failed to set mutually agreeable goals and objectives for her performance, as her previous supervisors had done.

The plaintiff submits that all of that leads to the inference that there was a concerted effort to make sure that she failed at the job because the defendants did not want a black person to have the job. The court finds that to be contrary to the facts.

## A

### Hiring of Kathleen R. Maturo

One of the original candidates for the coordinator job was Kathleen R. Maturo, a white female. Maturo had previously worked in the unit in which Cooney was a senior physician. Owing to space problems at the hospital, Maturo's work space, for a time, was moved to an office near the center reception area so that Maturo knew and was cordial with several staff members there, as well as with Cooney. Even so, she was not the top candidate for the job in the first instance. She was among the top four names whom the hiring committee submitted to human resources for a job offer to be made in September, 1995.

The top candidate was Alix Elkins, a white female, who was herself one of the displaced unit service managers. Upon her displacement, Elkins applied for the coordinator job and for the job of coordinator of volunteers. The latter was a part-time job, which was more to her liking at the time, and Elkins accepted an offer to fill that position. For the coordinator job, Maturo was the second choice.

The coordinator job was offered to Maturo in September, 1995, and then withdrawn because of the plaintiff's grievance. Maturo continued as an employee at Yale-New Haven Hospital, working full-time at the hospital as a care coordination assistant until mid-April, 1996, when she took a leave of absence due to pregnancy.

The coordinator job was reposted in 1996 after the plaintiff was released and the grievance proceedings ended. Maturo saw the new posting in June and filed a new application for the job on June 26, 1996. She did not discuss that application with Cooney. There is no evidence that Cooney was at all involved with the selection of Maturo as the new coordinator. In fact, by the

time Maturo was interviewed for the job in July, 1996,[21] Cooney had already exited as the interim director of the center and was himself replaced by Michael K. McCloud, the new medical director of the center.

Maturo was the successful candidate that time. She did not return to the hospital from maternity leave until mid-August, 1996, to begin preparations for transferring to the job at the center. Maturo successfully completed her probationary period and has received work performance appraisals since then that have rated her "far above expectations."

The plaintiff believes that Maturo received favorable treatment to the plaintiff's disadvantage throughout the relevant period. The plaintiff believes that Maturo had a special relationship with Cooney because she had worked for him as his secretary, that the criticisms of the plaintiff by Cooney were bogus so that the plaintiff could be let go in favor of Maturo, that the plaintiff's release from the job was timed to coordinate with Maturo's likely return from maternity leave and that Maturo's treatment after assuming the job was much more generous than that received by the plaintiff during her tenure there. None of those beliefs is supported by the evidence.

Maturo had no other relationship with Cooney than that of cordial coworker in a section of the hospital in which they frequently encountered one another. He was not her direct supervisor. Cooney's interest was not in placing any particular individual in the coordinator position, but in having some competent individual run the center. His evaluations of the plaintiff's work were valid assessments of her performance and were not designed to create grounds for her release. Maturo's

---

[21] Although Cooney remained involved with the center in that he saw patients and helped supervise physicians there, he had no further permanent supervisory role there after July, 1996.

maternity leave was not correlated to the plaintiff's discharge. Maturo did not even go out on maternity leave until after the plaintiff was released. Maturo endured unexpected health problems toward the end of her pregnancy. That the date of Maturo's return to take over the coordinator position was correlated to the plaintiff's release, or indeed that Maturo's return from maternity leave was even foreseeable at that point, is preposterous. There is no evidence to suggest that Maturo's performance in the coordinator job after her placement in the position was evaluated inaccurately by her supervisors or that she received benefits or perquisites that would not have been available to any competent employee in the position.

Interestingly, even if all of the plaintiff's beliefs about Maturo as a favored candidate were borne out by the evidence, it still is not suggestive of race discrimination. Rather, a motive based on a former favorable set of professional interactions is all that one could conclude.

## B

### "Secret Memos"

The court is unpersuaded that there was anything insidious about the "secret memos." First, the generation of written comments documenting incidents of very good or very poor work performance was not out of the ordinary. That such information was communicated to a supervisor, by coworkers or others, by e-mail or otherwise, can hardly be considered an unusual concept in a complex, busy workplace. As a supervisor herself while a unit service manager, the plaintiff had knowledge that such written communications occurred on occasion.

Second, the plaintiff was well aware of the information contained in the memos. While in the coordinator position, the plaintiff had a number of meetings with

Cooney and, in at least four of those meetings, he told her of specific incidents of problems on the job, including the names of client files, the times of the day and coworkers involved. On two of those occasions, Cooney attached writings generated by others to written performance critiques he gave to the plaintiff. The plaintiff knew that Cooney himself was on site during only part of the workday, owing to the fact that he was the interim director of the center so that he had substantial duties elsewhere in the hospital. Where could he possibly have gotten the information he shared with her? The only answer is that he was kept informed by the rest of the center's staff.

The plaintiff knew that criticisms of her work performance existed and that this information had been passed on by coworkers to her supervisor. The method of transmitting or retaining the information—by e-mail or written memo—is immaterial and entirely neutral.

Third, the accuracy of the information contained in the memos is supported by the evidence. The plaintiff never developed a satisfactory level of skill at managing a busy office. That was a source of frustration to her coworkers, who expected everyone to pull together as a team at the center. To the extent that some of the memos contain unfortunate language about the plaintiff, e.g., "more fuel for the fire," in commenting on her job performance, that suggests no racial prejudice, but only annoyance and aggravation that she was unable to get up to speed on the job.

Finally, to the extent that some of those so-called secret memos were generated by hospital management after Cooney made the decision to release the plaintiff, that likewise evinces no race based motives. The decision of Johnson, the vice president for employee relations, and himself a black person, to support Cooney's decision to release the plaintiff does not suggest any

motive to dismiss a black person, but rather to dismiss a substandard employee, whatever the employee's race.

## C

### Cooney's Scrutiny of Plaintiff

Another of the indicia of race discrimination to which the plaintiff cites is what she characterizes as the extraordinary scrutiny—the "micromanagement"—to which Cooney subjected her. The plaintiff presented evidence that this did not occur with her white predecessor or successor. The plaintiff viewed that scrutiny as an attempt to undercut her authority with her supervisees.

The court finds that there was no unnecessary scrutiny or interference by anyone with the way the plaintiff performed her job. To be sure, there were specific directions to the plaintiff by Cooney about how to utilize, and how not to utilize, staff. The plaintiff was told on more than one occasion not to use the transcriptionists to cover the front desk if there was typing waiting to be done. The plaintiff persisted in directing them to cover the desk anyway. The plaintiff was told on more than one occasion that she, not the receptionist, needed to follow-up on certain telephone calls. The plaintiff nonetheless gave that work to the receptionist. In the interest of accomplishing the work of the center, Cooney was extraordinarily explicit with the plaintiff in counseling her about how to get the job done. Such direction was not needed before or since because the previous and subsequent coordinators were able to develop into accomplished managers in a way that eluded the plaintiff. There is no evidence of race discrimination in the way Cooney supervised the plaintiff.

## D

### Cooney's Evaluation of Plaintiff

The plaintiff believes that Cooney utilized an improper procedure in evaluating her work and that

this led to a situation in which she was set up to fail. The plaintiff claims that Cooney was required to create with her a written set of goals and expectations that would be the basis for any evaluation of her work during her probationary period. That does not accord with the evidence, however.

The human resources policy and procedure manual section on orientation period policy states that the performance standards to be attained during the probationary period are defined by the job description. The practice of creating goals and objectives for future evaluations was not utilized until after the successful completion of the orientation-probationary period. Even Maturo, whom the plaintiff believes received more favorable treatment, did not work with her supervisor to develop a set of goals and objectives, more elaborate than the job description, until nearly one year into the job. Moreover, the development of such a document was first committed to the employee, not the supervisor, as the plaintiff well knew. In her years as a unit service manager, the plaintiff had learned that a draft of a set of goals and objectives for the following year was generated by the employee whose work was to be evaluated and was refined in consultation with the supervisor. During the plaintiff's months as coordinator, she neither complained about the lack of, nor took any steps to execute, such criteria.

There was nothing else about the manner or duration of the plaintiff's evaluation period that was not in accordance with the hospital's standard procedure. None of that creates any inference of a race based discharge. The court finds that the plaintiff has failed to make out a prima facie case of race discrimination.

## E

### Poor Performance as Pretext

The court will nonetheless address the issue of pretext, which the plaintiff would otherwise have the bur-

den of proving in light of the defendants' credible evidence that she was discharged for the legitimate, nondiscriminatory reason of poor work performance.

Because this is a race discrimination claim, it is useful to know the race of those whom the plaintiff believes were responsible for the situation in which she found herself. Cooney, her direct supervisor whom she asserts unfairly evaluated her management skills, is white. Johnson, the vice president of employee relations and the administrator who declined to intervene to block her discharge, is black. Wilson, the supervisor who first described her poor management skills and rated her as performing "below expectations" in a performance appraisal, is black. DeWitt, the next supervisor who also rated the plaintiff's skills as "below expectations" on subsequent performance evaluations, is black.

The identification by Cooney of the plaintiff's lack of management skills during her probationary period at the center was remarkably similar to that in the evaluations of the plaintiff's two prior supervisors, Wilson and DeWitt. Those supervisors were both black. They lacked any motive to unlawfully discriminate against the plaintiff. In that context, Cooney's assessment does not represent an aberration. Cooney's evaluation of the plaintiff's work performance appears consistent and credible. The plaintiff's work was unsatisfactory, and it was within the discretion of the defendant to release her.

The court finds that the defendants have articulated and proved a legitimate, nondiscriminatory reason for the plaintiff's discharge, namely, poor work performance, and the plaintiff has failed to show that this reason is pretextual.

The court finds no violation of Title VII of the Civil Rights Act of 1964.

## XI

## COUNT ELEVEN—VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e ET SEQ.—RETALIATION

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to retaliate against an employee who has either "opposed any practice made an unlawful employment practice . . . or participated in any manner in an investigation, proceeding, or hearing *under this subchapter*." (Emphasis added.) 42 U.S.C. § 2000e-3 (a). Although it is true that the plaintiff initiated a grievance against the defendant for failure to award her the coordinator job, her grievance was based solely on the failure of the hospital to follow its written guidelines for placement of redesign affected employees. The grievance raised no issues under Title VII at all. At the close of the plaintiff's case, the evidence was insufficient as a matter of law to support a prima facie case of unlawful retaliation under Title VII. Accordingly the court dismissed that count on the defendants' motion under Practice Book § 15-8.

### A

### SPECIAL DEFENSE—FAILURE TO MITIGATE DAMAGES

In the interest of disposing of all issues raised by either side, the court will comment briefly on the defendant's special defense that the plaintiff failed to mitigate damages. That is made somewhat awkward because of the failure of the plaintiff to articulate in her papers any calculation of what she believes her damages to be and the lack of any evidence from her or the defendants to show what the going wage was for someone of her background had she located a full-time job after her release.

In 1995, the last complete year the plaintiff worked at Yale-New Haven Hospital, her gross income from employment was $33,405 and her adjusted gross income was $14,009.[22] After losing her job in 1996, she continued to manage four rental properties she owned that operated at a loss. She thereafter derived income from work as a substitute teacher in Hamden and New Haven. The plaintiff, for whatever reason, did not make a good faith attempt to seek full-time employment. She certainly did not apply for a number of available local jobs in the health care field. Her attempts to search for a job were so sporadic and so highly selective as to guarantee failure.

In a wrongful termination case, the measure of damages is "the wages [the employee] would have earned under the [employment] contract, minus any wages which he has earned or could have earned elsewhere, and the burden of proof of the latter is on the employer." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 33, citing *Carter* v. *Bartek*, 142 Conn. 448, 451–52, 114 A.2d 923 (1955).

The defendant has proved that the plaintiff failed to mitigate damages. The court finds that it is more likely than not that had the plaintiff made a consistent, reasonable effort to become reemployed in the period after her job loss, given her educational background and more than twenty-five years of steady employment, she would have found a suitable position, if not at her previous wage, then at an amount close to it.

Because the court has found that the plaintiff has failed to prevail on any of the counts in her complaint, the court need not analyze further the damages of the plaintiff.

---

[22] Although the plaintiff's gross income from employment was $33,405, she owned rental properties on which she showed a loss of more than $20,000.

## CONCLUSION

The plaintiff has failed to prove any of the claims against any of the defendants. Accordingly, the court finds in favor of the defendants on all counts and against the plaintiff, and renders judgment accordingly.